STATE OF MINNESOTA *vs.* PETER JOHNSON.

December 8, 1887.

37  493
41  288

**Criminal Law—Murder—Indictment.**—An indictment for murder in the first degree, in the form given in Gen. St. 1878, *c.* 108, is good, under the Criminal Code.

**Same—Indictment against Several.**—An indictment against two or more persons may charge the act to have been done by them collectively.

**Same—Immaterial Defect in Indictment.**—Putting the date when and the place where found, at the end of an indictment, after the words: "against the peace and dignity of the state of Minnesota," does not vitiate it; such date and place are no part of the indictment.

**Same—Evidence.**—Evidence *held* sufficient to sustain the verdict. Divers assignments of error upon exceptions to evidence and refusals to admit evidence overruled.

**Same—Requests to Charge—Manslaughter in First Degree.**—Requests to charge *held* not to present the question whether one who does not himself strike the blow may be convicted of manslaughter in the first degree.

**Same—Single Fact Inconsistent with Guilt.**—A request to charge that if a single fact, proved to the satisfaction of the jury, was inconsistent with defendant's guilt, he should be acquitted, rightly refused.

**Same—Reasons for Instructions.**—In its charge to the jury the court need not state the reason for the rule that guilt must be proved beyond a reasonable doubt, if it state the rule correctly.

The defendant was tried, with two others, in the district court for Dakota county, before *Crosby*, J., on an indictment for murder in the first degree, and was found guilty of manslaughter in the first degree. He appeals from an order refusing a new trial.

*H. L. Williams*, for defendant.

*Moses E. Clapp*, Attorney General, and *Albert Schaller*, for the State.

GILFILLAN, C. J. The defendant was indicted with two others for murder in the first degree, and was convicted of manslaughter in the first degree. Several exceptions are taken to the indictment: *First.* It does not allege that the killing was done "with a premeditated de-

sign to effect the death" of the person killed, which words are used by the Criminal Code in defining the crime. Penal Code, § 152. It follows the form given in Gen. St. 1878, c. 108, § 2, which, instead of the foregoing words, uses the words "without the authority of law, and with malice aforethought." The definition of murder in the first degree in the Criminal Code is in substance the same as in Gen. St. 1878, c. 94, § 2. Chapter 108, prescribing forms for indictments, is not expressly repealed by the Criminal Code. It is still in force, except so far as inconsistent with the provisions of the latter. A form of indictment prescribed by that chapter for an offence defined in the same manner in both the General Statutes and Code, is not inconsistent with the latter; so that where the definition of the offence is the same, the form prescribed in chapter 108 may be used. *Second.* The indictment charges the act to have been done by the three persons collectively, instead of charging it to have been done by them severally. There is nothing in that exception. As charged, the act was that of each and all. *Third.* That the indictment does not conclude with the words "against the peace and dignity of the state of Minnesota," as required by the constitution. This is claimed because at the bottom of the indictment are the words : "Dated at Hastings, in the county of Dakota, this twenty-first day of January, A. D. 1887." These words are no part of the indictment; their presence adds nothing to it, their absence would take nothing from it; it is concluded before those words are reached. The exception is not well taken.

The evidence in the case was mainly circumstantial. The killing occurred at about 11 o'clock of a Saturday night. The evidence shows that Morrow, the person killed, had been drinking during the evening, and evidently he was partially drunk, and in a quarrelsome mood. The defendant and the other two with whom he was indicted had apparently been drinking during the evening, and were, as the evidence indicates, going about together. It also indicates that there had been something like a quarrel between them and Morrow, though by whom incited does not appear. At about 11 o'clock a witness (Rogan) saw defendant, and the two others indicted with him, and another walk from a saloon into the street. The witness entered the

saloon, took a drink and came out, and saw the four men standing together in the street talking among themselves, and Morrow also in the street, 12 or 14 feet from and facing them. The latter was evidently intent on quarrelling with the four. To them, or in their hearing, he expressed a desire to fight them, applying to them a most insulting and opprobrious epithet. The four men then ran up to Morrow, and one of them (Anderson) struck him with his fist; one of the four men (the one not indicted) then appears to have gone away, and, the witness calling Swenson, the two started to go home, leaving defendant and Anderson standing near Morrow. As they were leaving, the witness heard defendant say something in Swedish which the witness did not understand, which caused Swenson to turn around, and start to go back. The witness also turned around, and saw Morrow in the act, apparently, of falling, though he did not stop to see whether he actually fell. At the time, defendant and Anderson were five or six feet from Morrow, Anderson being nearer to him than defendant. Within a very few minutes afterwards, the jury might find immediately after, Morrow staggered against the door of a saloon near which the parties had been standing, and, on those within opening the door, they found him lying on the ground with a deep gash, evidently made by a sharp knife or some similar instrument, in the left side of his neck, from which he died in a very short time.

From this evidence, which the jury might credit instead of that of defendant and Swenson, they might well find that the fatal blow was struck by defendant or Anderson. There are some circumstances from which they might find that it was struck by defendant. In the first place,—although by itself it was not a strong circumstance, yet it might be considered,—it was proved that about two weeks before, he had in his possession a jack-knife which, from its description, was capable of inflicting such a wound as that on Morrow; then it appears that, after what Rogan saw, Anderson and defendant immediately left, the former going home, and the latter in the same direction, and while those from the saloon were looking at the body of Morrow, immediately after he fell at the door of the saloon, defendant and Swenson came up to where they were, the defendant

holding his right hand behind him in such a way as to attract the notice of the witness; and the next morning, when the officers arrested him, (he was in bed at the time, and arose and dressed,) on being brought out of doors, as one of the witnesses testified, "he kind of looked at himself all around, and noticed something on his hands. I thought it was blood, and he stooped down, and I took hold of his hands, and said: 'This fellow has got blood on his hands, and is trying to rub it off.'" The witness also testified that defendant picked up a handful of sand; that the spots of what he thought was blood were on the right hand only, and that there was a spot on his coat that looked like blood. Another witness testified that he came up when defendant was brought outside, and proceeded: "When I came up, he was stooping down and trying to get some sand or dirt in his hands, and he held it there, and I said: 'What are you trying to wash the blood off for?'" He also testified that he thought the spots on defendant's hand were blood. Another witness, who was present when defendant was brought out, on being arrested, testified: "When he came out he put his hands on the ground, just as if he was going to wash them off."

The fact that after Rogan saw Morrow, Anderson, and defendant standing near each other, the latter and Swenson started off, and then turned back and came to where Morrow was lying when those in the saloon had come out and were looking at Morrow, was proved beyond question; yet the next morning, when asked if they had done so, they denied it. Some of these circumstances the defendant in his testimony denied, other of them he attempted to explain, as that the red spots on his hand were spots of paint which he got on it in the course of his occupation during the day. It was for the jury to determine how much weight to give to these denials and explanations, as it was with respect to the other testimony in the case. There was enough evidence to leave the case to the jury.

The evidence of the witness O'Connell, as to the conversation by the parties in the street, was proper, for, though he could not identify them, they were identified by Rogan, defendant being one of them. The exhibition of the clothes which deceased wore at the time of his death could furnish but slight evidence, but, especially in view of the

suggestion of the defence that it was a case of suicide, it was compe-
tent. The evidence, to introduce which the defendant requested that
the case might be reopened after the testimony was closed, was mere
hearsay.

After the court had charged the jury, the defendant excepted to
its refusal to define manslaughter in the second degree. It defined
murder in the first and second degrees, and manslaughter in the first
degree, but we do not find in the case any request to define man-
slaughter in the second degree. Had the defendant supposed such
definition would be of any benefit to him, he ought to have requested
it to give such definition, and, not having done so, there was no
ground for the exception.

The defendant's request to charge referred to in his ninth, and the
first referred to in his tenth, assignment of errors, assume that, un-
less defendant himself struck the fatal blow, or if the evidence impli-
cated some one else, the defendant must be acquitted. The requests
were entirely inadequate to present the question raised here on the
argument, to wit, that there cannot be an accessory in manslaughter.
There was no request nor exception that presented the point. The
requests we refer to were to the effect that if any one else struck the
blow, or if the evidence pointed as much to the guilt of some one else
as of defendant, he should be acquitted. As applied to the evidence
in the case, the requests were erroneous; for, whether there may be an
accessory in manslaughter or not, there certainly may be in murder,
the crime charged in the indictment, and of which, upon the evidence,
the jury might have convicted. The requests called for an acquit-
tal, even though the killing were with a premeditated design to effect
death, and though defendant were present, inciting, aiding, and abet-
ting the act, provided he did not with his own hand strike the blow,
or provided the evidence applied as well to another person as to de-
fendant. Had the jury found that it was murder, surely no one
would claim that defendant, if aiding and abetting, or if only equally
guilty with another, could not be convicted.

Two of the requests were to the effect that if a single fact, proved
to the satisfaction of the jury, was inconsistent with the defendant's
guilt, he should be acquitted. The jury were to try the case upon

all the evidence, not on the evidence merely as to single facts. Where the evidence is, as in this case, mainly circumstantial, there may be isolated facts proved, which of themselves are, or seem, inconsistent with guilt, while other facts may seem inconsistent with innocence. The jury must arrive at a conclusion by weighing and comparing all such facts. The requests were erroneous. The court charged correctly that, to authorize a conviction, the circumstances should not only be consistent with the prisoner's guilt, but they must be inconsistent with any other rational conclusion. The charge of the court as to the effect of the absence of apparent motive was correct, and so was its refusal to state the reason for the rule requiring that guilt must be proved beyond a reasonable doubt. The evidence was such as to justify the verdict.

Order affirmed.

MITCHELL, J. I dissent for the reason that, in my judgment, the evidence was not sufficient to warrant a conviction. It would subserve no good purpose to refer to the testimony, further than to say that it seems to me that the opinion of the court does not give a full and accurate statement of the facts as they appear from the whole case.

A motion for reargument in this case was denied December 14, 1887.