**STATE of Minnesota, Respondent,**

v.

**John Arthur KIRCH, Appellant.**

**No. 81–405.**

Supreme Court of Minnesota.

Aug. 13, 1982.

C. Paul Jones, Public Defender, and Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary Hansen and John H. Daniels, Jr., Sp. Asst. Attys. Gen., St. Paul, Julius Gernes, Winona County Atty., Winona, for respondent.

WAHL, Justice.

Defendant John Arthur Kirch appeals from a conviction of first-degree murder in connection with the shooting death, on September 7, 1980, of John Schneider, a Winona County Deputy Sheriff. After being indicted by the Winona County Grand Jury, Kirch moved for a change of venue. He was tried in Olmsted County District Court, convicted, and sentenced to life imprisonment. We affirm his conviction.

The events culminating in Schneider's death all occurred at a trailer home in Goodview, Minnesota, where Kirch was living with his wife, Brenda, and their three children: Jana (age 12), John, Jr. (age 9) and Jackie (age 15 months). After an argument with Brenda on the morning of September 7, Kirch locked himself in the trailer with Jackie. Brenda, who objected to leaving Jackie by herself with Kirch, told him she was going to call the sheriff. Kirch responded that he would shoot or kill anyone who would come through the door.[1]

Brenda went to her mother's house, where she called both Darrell Warnke, a social worker who had worked with the Kirch family, and Chief Deputy Vern Spitzer. Warnke and Spitzer agreed that, because Kirch was acting "crazy" and because there was a gun in the trailer, the sheriff should go out to the Kirch residence to try to resolve the situation. Spitzer and two other deputies, Schneider and Larson, left for the trailer court around 12 noon, Spitzer and Schneider dressed in plain clothes and driving an unmarked car, Larson dressed in his uniform and driving a marked car. At trial, Kirch admitted having seen the marked car drive up outside the trailer.

Kirch remained inside the trailer with Jackie from the time Brenda left until the deputies arrived. He testified that he got out the .22 rifle and put it together because he was worried that Brenda's brothers would come over and try to take Jackie away. He then went to a dresser drawer and got a few bullets, putting one in the gun and the others in his pocket. After loading the gun, Kirch picked Jackie up and carried her and the rifle into the kitchen area, where he placed the gun up against the room divider between the kitchen and the living room. He then sat down at the kitchen table to have a cigarette and some pop. Kirch continued to hold Jackie during this time.

Kirch was walking back and forth with Jackie in his arms when he saw the sheriff's car pull up outside the trailer. By this time

---

1. There was a discrepancy in the testimony as to the exact words used by Kirch. Kirch testified that he did not remember making such a statement: "I'm not denying it. I just don't recall it." Brenda testified that Kirch said he would kill anyone who came through the door, while John, Jr. was positive that Kirch used the word "shoot" rather than "kill."

he had put an easy chair against the door and pulled the shades down. Kirch testified, however, that he was not expecting the sheriff to come out, because Brenda had failed to carry out similar threats on other occasions; in fact, Kirch said he expected Brenda herself to return soon. When Kirch saw the deputies arrive, he moved a kitchen chair so that he could kneel behind it and be out of sight of the deputies: "I thought if they couldn't see me, if I didn't answer the door, they might not think I was home and just leave." Jackie was standing beside her father as he knelt behind the chair.

Upon their arrival at the trailer, the deputies first tried to open the combination door. When they found it locked, they began knocking on it. Spitzer testified that they knocked loudly several times and shouted out, "John, Sheriff's Department, come out, we want to talk with you." When there was no response from Kirch, Spitzer continued to shout and pound on the door. After talking to a neighbor girl who had seen Kirch and Jackie inside the trailer just a short time earlier, Spitzer decided to enter the trailer.

The deputies pried open the combination door but then could not open the inside door. They remembered that Brenda had said the door did not lock properly, so Schneider, who was heavier than Spitzer, moved up and pushed the door with his shoulder. The door swung open far enough to allow the officer to enter. Schneider went in first and walked over to the area in front of the living room couch. None of the officers had yet drawn his gun.

Schneider then looked down the hallway, spotted Kirch and said to Spitzer, "Vern, look out he has got a gun." Spitzer saw Schneider reach for his gun and, as he started to pull his own gun, heard a shot ring out. Schneider took two or three steps toward Spitzer and fell on the floor near the couch. As Schneider fell, his gun went off.

Kirch testified that he was afraid the deputies were going to take Jackie away. He had the gun leaning on the back of the chair and was pointing it in Schneider's direction "to keep him from coming up and getting the baby away." He stated that he had no intention of firing the gun and that, when Schneider grabbed for his gun, "the next thing I knew my gun went off." Kirch testified that he did not aim the gun.

After the shooting, Kirch ran down the hall to the back bedroom. Spitzer called to him, "Come out, you son of a bitch, you just shot a deputy." Although Kirch said at the time that he thought they were burglars, he has admitted that he realized all along they were officers. He testified at trial that he told the deputies he thought they were burglars because he was "trying to calm them down."

Larson and Spitzer then tried to convince Kirch to come out of the back bedroom. Spitzer threw his identification wallet down the hallway so that Kirch would be certain they were officers. However, in answer to the deputies' pleas to come out, Kirch continued to respond, "Well, I don't know who you are." Finally, Deputy John Lettner arrived on the scene. He turned off the television, identified himself to Kirch and reassured him that the deputies would not hurt him if he came out. It was Lettner who ultimately persuaded Kirch to surrender himself.

When Kirch came out from the back bedroom, he was frisked and escorted from the trailer. He handed Jackie to Brenda and then was handcuffed and taken to the Law Enforcement Center. Agent Dennis Fier of the Minnesota Bureau of Criminal Apprehension and Deputy LaMar Fort searched the trailer immediately but found no one else there.

There is no question but that Kirch fired the shot that killed Schneider. The issues raised by this appeal are (1) whether the evidence is sufficient to support a conviction of first-degree murder and (2) whether a defendant's waiver of his right to a jury trial is voluntary and intelligent when it is offered in response to the trial court's refusal to rule on requested instructions prior to trial and when certain highly prejudicial testimony is relevant only if certain instructions will be given.

1. The law governing first-degree murder in the State of Minnesota is that "Whoever * * * [c]auses the death of a human being with *premeditation and intent to effect the death* of such person or of another [is guilty of murder in the first degree]." Minn.Stat. § 609.185(1) (1980) (emphasis added). Kirch argues that the evidence will not sustain a finding of premeditation which, as defined by statute, means to "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (1980).

■ It is well-established that, because premeditation is a product of the mind, it is incapable of direct proof: "Premeditation may be inferred from all the circumstances surrounding the homicide." *State v. Gowdy*, 262 Minn. 70, 75, 113 N.W.2d 578, 581 (1962) (footnote omitted). In this case, the trier of fact found that Kirch (1) stated that "he would shoot anyone that came through the door," (2) assembled a .22-caliber rifle and loaded it with live ammunition, and (3) had additional bullets in his shirt pocket and reloaded the gun after the shooting. The trial court concluded that this evidence demonstrated premeditation and intent.

■ Kirch does not dispute testimony that he threatened to shoot anyone who came through the door of the trailer. He argues that mere threats coupled with a homicide do not necessarily establish premeditation and intent. However, the facts of the cases he cites to support this proposition are quite different from the facts of this case. In *State v. Gibbons*, 305 N.W.2d 331 (1981), we ruled that the state had not established premeditation by showing that defendant had previously aimed a loaded gun at the victim, because other evidence did not exclude inferences other than that of defendant's guilt. In *State v. Swain*, 269 N.W.2d 707 (1978), we discounted defendant's threat because it was too remote in time to bear on the issue of premeditation. Defendant had stated that he would like to kill the victim some 10 months before he actually killed her.

In this case, Kirch's threat preceded the act of shooting by about 1 hour. Since Kirch made the threat and then went into the trailer to get the gun, the threat was part of a single series of events leading up to the shooting. It was not an isolated statement as in *Swain* and cannot be separated from the rest of Kirch's actions. Hence, it is evidence of Kirch's plan to shoot and of his preparation for the ultimate act.

■ Kirch then assembled and loaded the rifle. It is well-established that preparation to shoot is evidence of premeditation and design. *State v. Neumann*, 262 N.W.2d 426 (Minn.1978). Kirch argues, however, that he loaded the gun in anger and that he wanted it "for show." Even if, as the defense argues, Kirch loaded the gun in anger, he had, according to his own expert, calmed himself by drinking pop and smoking cigarettes after he loaded the gun. If, as the defense suggests, Kirch had calmed down, then he had time to change his course, time to unload the gun or put it away. It is insufficient to argue that he loaded the gun in anger and foolish to suggest that he wanted it "for show." A gun that is needed only "for show" need not be loaded.

The Advisory Committee notes, in its Comments to the definition of "premeditation," that "arming oneself prior to a robbery expecting to kill if need be anyone obstructing the plans would be sufficient to come within the definition even though it may be hoped and anticipated that the need for killing would not occur." Minn.Stat. Ann. § 609.18, at 192 (West 1964). Arming oneself shows premeditation because one is planning for the possibility of killing. While Kirch may have anticipated that he would not have to kill, such hope does not justify the conclusion that he did not plan or prepare for such a possibility.

■ The fact that Kirch reloaded the gun after killing Schneider is consistent with the theory that he planned and prepared for the shooting. When considering the "totality of the circumstances" in order to assess premeditation, we have not confined our-

selves to events and acts which preceded the killing. A defendant's actions after the act may also evidence the degree of his planning and preparation for the act itself. *See State v. Hardimon*, 310 N.W.2d 564, 566 (Minn.1981).

"In considering the sufficiency of the evidence to support a conviction, the scope of [this court's] review is limited to the question of whether the [finder of fact], with regard to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, could reasonably have found defendant guilty." *State v. Berry*, 309 N.W.2d 777, 783 (Minn.1981) (citation omitted). In this case, several pieces of evidence support the trial court's conclusion that Kirch planned and prepared for the killing, and no evidence supports an opposite conclusion. We hold the evidence sufficient to sustain the conviction.

**2.** The crux of Kirch's second argument on appeal is that his waiver of a jury trial was not voluntary and intelligent because it was prompted by the trial court's refusal to commit itself to a jury instruction on first-degree manslaughter. He contends that he has been prejudiced by certain testimony which he would not have put into evidence at trial had he known whether or not the court would refuse to give the manslaughter instruction. There is no authority for the proposition that a trial court must make a commitment to the giving of a particular instruction before the trial begins. In fact, the weight of authority supports an opposite conclusion. Under the Rules, a party may request particular instructions "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs." Minn.R.Crim.P. 26.03, subd. 18(1) (1982). "The court in its discretion shall instruct the jury either before or after the arguments are completed." Minn.R.Crim.P. 26.03, subd. 18(4) (1982). These rules support the concepts that timing of the instruction is discretionary with the court and that, ordinarily, the court does not rule on the giving of a particular instruction until all of the evidence is in.

As the defense notes, there is growing support for the idea of preliminary jury instructions. Comment, *Memory, Magic and Myth: The Timing of Jury Instructions*, 59 Or.L.R. 451 (1981). In fact, the Minnesota Rules allow the trial court to give such instructions. "After the jury has been impaneled and sworn, and before the opening statements of counsel, the court *may* instruct the jury as to the respective claims of the parties * * *. Preliminary instructions *may* also include * * * the essential elements of the offense * * *." Minn.R.Crim.P. 26.03, subd. 4 (1982) (emphasis added). However, such instructions are discretionary, and their use would not obviate the possibility or necessity of amendment or augmentation after the evidence is in. In short, since the final instructions depend on the evidence that has been submitted, it would be impossible, and unwise as well, for a court to offer the kind of guarantee the defense in this case desired.

It is true that a waiver of jury trial must be voluntary and intelligent. *Patton v. United States*, 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930). In this case, the trial court questioned Kirch at length and was assured that Kirch understood (1) that he was entitled to trial by a jury of 12 persons, (2) that a guilty verdict would have to be unanimous, (3) that, by waiving a jury trial, he was putting the determination of guilt in the hands of only one person, (4) that he was presumed innocent, and (5) that if he were convicted, the judge would fix the punishment. Kirch also told the court that he had fully informed his attorney about the nature of his case, that his attorney had represented his interests adequately, and that he was taking no mind-altering drugs. After the questioning, the defense offered into evidence a signed waiver.

When Kirch waived his right to a jury trial, he knew that the trial court had refused to accept his plea to manslaughter in the first degree and with this knowledge proceeded with the waiver. To allow him now, with the benefit of hindsight, to change

that decision would be to render ineffective the right to waiver. Such a result would be in the interest of neither the public nor the judicial system.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.