**STATE of Minnesota, Respondent,**

v.

**Audie MATTHEWS, Appellant.**

**No. A10–0246.**

Supreme Court of Minnesota.

July 27, 2011.

---

630

Lori Swanson, Attorney General, St. Paul, MN; and John Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Audie Matthews was found guilty by a jury of first-degree murder, Minn.Stat. § 609.185(a)(3) (2010), for the March 8, 2008, shooting death of Blaine Christofferson. The district court convicted Matthews and imposed a sentence of life imprisonment. In this direct appeal, Matthews asserts two arguments. First, Matthews argues the district court erred in admitting expert testimony that the police dog tracked a "fear scent." Second, he argues the State failed to present sufficient evidence to support his conviction. Because we conclude that there is no reasonable likelihood the "fear scent" testimony substantially affected the jury's verdict and the State presented sufficient evidence to support the conviction, we affirm.

In the early morning hours of March 8, 2008, police responded to a report that an individual wearing a mask and dressed in black shot and killed Blaine Christofferson in a parking lot near the Cherry Pit Bar in St. Paul, Minnesota. Using a police dog, the police officers located a mask, black clothing, and a gun, which, when tested, were shown to contain DNA samples that were consistent with Matthews' DNA profile.

Following the police investigation, a grand jury indicted Matthews for first-degree murder in violation of Minn.Stat. § 609.185(a)(3) (causing the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit aggravated robbery). Matthews pleaded not guilty and demanded a jury trial. The State presented the following evidence at trial.

On the night of March 7, 2008, Christofferson and several friends went to the Cherry Pit Bar. Christofferson was carrying $2,000 on his person. As Christoffer-

son's group drank alcoholic beverages, a male bar patron approached a woman in Christofferson's group. When the woman declined the patron's advances, he became angry and was removed from the bar. At closing time, Christofferson and his friends left the bar. While walking to the parking lot across the street, the ousted bar patron approached the group. Christofferson intervened to "calm things down" and then walked across the street to the parking lot. Nearby security cameras captured some of the events that followed.

The security videos show Christofferson and his friends walking toward their vehicle, which was parked in a lot near the Cherry Pit Bar. As Christofferson started to enter the vehicle, an individual dressed in black ran up to Christofferson and pulled him back. A struggle ensued and Christofferson lost his jacket. At the same time, a light-colored mini-van entered the parking lot. Christofferson was shot by the individual dressed in black. The exact timing of the shooting and the departure route of the shooter were not clear from the video. The light-colored mini-van exited the parking lot, headed east on Minnehaha Avenue, made a U-turn, and headed west on Minnehaha.

When the police responded to a 911 call reporting the shooting, three separate events of importance occurred at about the same time. A police officer observed the appellant, Audie Matthews, a few blocks from the scene of the shooting. Matthews was walking down the sidewalk, wearing a black shirt and black pants, but no coat or jacket. The officer thought Matthews' conduct was suspicious because the outside temperature was 5 degrees Fahrenheit. When the officer stopped and spoke with Matthews, the officer observed that Matthews was sweating profusely and had tree debris on his shoulder. Matthews told the officer that when he left the Cherry Pit

Bar, he saw police in the area and decided to walk home because he did not have a valid driver's license.

Also, while en route to the crime scene, a police officer observed a fast-moving mini-van. The officer stopped the mini-van. The mini-van driver, who was later identified as Mursjoni Moten, jumped out and shouted, "I didn't shoot him, I didn't shoot him." The officer noticed that the driver's side sliding door of the van was open.

Additionally, a police dog picked up a "fear scent" near the scene of the shooting and followed the scent through the neighborhood. The dog's handler, Officer Brady Harrison, testified at trial that a "fear scent" occurs "when someone is excitable or stressed out[;] someone that could have just been in an accident or someone that is running from the police will emit these odors from their apocrine glands which are located in the groin area and in the armpits of your body." During the tracking, the dog located, and the police recovered, a winter hat, black jacket, gloves, ski mask, handgun, and another jacket. The clothing was recovered in a wooded area. The dog lost the scent near the location where the first officer stopped Matthews for questioning.

Matthews was interviewed at the police station later that morning. During the interview, Matthews stated that he met a woman at the Cherry Pit Bar and that they left the bar together and had sex in her car. Matthews stated that he left his coat and hat in her car. The police examined Matthews' shoes and concluded that the pattern on the shoes was similar to the pattern of the shoeprints near the clothing and gun found by the police dog.

Dr. Victor Froloff, a forensic pathologist who performed the autopsy, testified that Christofferson was struck by a bullet that entered his lower right back and exited

from the left side of his body. The bullet struck the spinal cord, causing immediate paralysis. Christofferson died of blood loss.

Two tape-recorded jailhouse phone calls between Matthews and his parents were played for the jury. In one phone call, Matthews said, "[I]t was a situation that went wrong," and "[t]hings happened that wasn't suppose[d] to." In the second phone call, Matthews said, "They got shoeprints that, that match my shoes. They got foot prints that ... match my foot prints. They found the weapon, they got a coat, they got gloves, they got [a] hat ... DNA's going to pop up."

A Bureau of Criminal Apprehension forensic scientist examined the handgun found that evening and the two cartridge casings found near Christofferson's body, and determined that the gun was used to fire the cartridges. A swab taken from the gun indicated a DNA mixture of three or more individuals. Christofferson and Matthews could not be excluded as possible contributors, but Moten, the mini-van driver, was excluded. Swabs were also taken from the black winter hat and brown ski mask. Matthews could not be excluded as a contributor from either item, but Moten was excluded.

Matthews did not testify and did not present witnesses on his behalf. The jury found Matthews guilty of first-degree murder and second-degree murder. The district court convicted Matthews of first-degree murder and imposed a life sentence.

## I.

Matthews' first argument on appeal is that he is entitled to a new trial because the district court erred in allowing expert testimony by Officer Harrison that the police dog picked up a "fear scent" near the crime scene, tracked it through the neighborhood as the police dog located various items of clothing, and stopped near where Matthews was found by the police. Specifically, Matthews argues that the "fear scent" testimony was not helpful to the jury, did not have foundational reliability, was not relevant, and was unfairly prejudicial. We conclude that Matthews is not entitled to a new trial because he failed to establish a reasonable possibility that the "fear scent" testimony substantially influenced the jury's verdict.

## A.

As a threshold issue, the parties disagree as to the standard that controls our review of the "fear scent" issue. The parties' arguments reflect differing views of Matthews' efforts to preserve the issue at trial.

■ Matthews claims the record demonstrates that he made timely objections to the "fear scent" testimony, and therefore the harmless error standard controls our review. *See State v. Sanders,* 775 N.W.2d 883, 887 (Minn.2009) (explaining that if a defendant objects to the admission of evidence at trial, the admission of that evidence is reviewed under the harmless error standard). Under the harmless error standard, a defendant who alleges an error that does not implicate a constitutional right must prove there is a " 'reasonable possibility that the wrongfully admitted evidence significantly affected the verdict.' " *State v. Holliday,* 745 N.W.2d 556, 568 (Minn.2008) (quoting *State v. Robinson,* 718 N.W.2d 400, 407 (Minn.2006)).

■ The State, on the other hand, contends that the record demonstrates that Matthews failed to make timely objections to the testimony and therefore the plain error standard controls our review. *See State v. Strommen,* 648 N.W.2d 681, 686 (Minn.2002) (explaining that if a defen-

dant fails to object to the admission of evidence at trial, the admission of evidence is reviewed for plain error). Under the plain error review standard, the defendant must establish (1) an error, (2) that was plain, and (3) that affected the substantial rights of the defendant. *Id.* If these three prongs are established, we will correct the error only if the error seriously affects the fairness, integrity, or the public reputation of judicial proceedings. *State v. Griller*, 583 N.W.2d 736, 742 (Minn.1998). A plain error affects the substantial rights of the defendant when "there is a reasonable likelihood that the error substantially affected the verdict." *Strommen*, 648 N.W.2d at 688. The court's analysis under the third prong of the plain error test is the equivalent of a harmless error analysis. *State v. Reed*, 737 N.W.2d 572, 584 n. 4 (Minn.2007). If the defendant fails to establish that the claimed error affected his substantial rights, we need not consider the other plain error factors. *State v. Goelz*, 743 N.W.2d 249, 258 (Minn.2007).

### B.

Because Matthews failed to establish a reasonable likelihood that the admission of the "fear scent" testimony significantly affected the verdict, and because the third prong of the plain error standard is the equivalent of this harmless error analysis, we conclude that Matthews' claim fails under either plain error or harmless error review. Therefore, we need not, and do not, decide whether the record demonstrates that Matthews made timely objections to the "fear scent" testimony.

■ In reaching our conclusion that Matthews failed to establish a reasonable likelihood that the admission of the "fear scent" testimony significantly affected the verdict, we consider the four factors for harmless error review set forth in *State v. Ferguson*, 581 N.W.2d 824, 833 (Minn.

1998). Those factors are (1) the manner in which the State presented the testimony, (2) whether the testimony was highly persuasive, (3) whether the State used the testimony in closing argument, and (4) whether the defense effectively countered the testimony. *Id.* We now discuss each of these factors.

■ The manner in which the State presented the "fear scent" testimony did not create a reasonable likelihood that the admission of the testimony substantially affected the verdict. The State did not present any "fear scent" testimony during Officer Harrison's direct examination. Instead, the prosecutor elicited the testimony on re-direct examination in response to an issue that arose during cross-examination. More importantly, the presentation of the "fear scent" testimony was brief, and the term "fear scent" was used in only four sentences of Officer Harrison's 42–page testimony.

The "fear scent" testimony was not highly persuasive on the issue of guilt. Officer Harrison testified that a "fear scent" occurs "when someone is excitable or stressed out[;] someone that could have just been in an accident or someone that is running from the police will emit these odors from their apocrine glands which are located in the groin area and in the armpits of your body." He noted that a trained dog will "go to the person that has that fear scent, that odor, because that's what they have been trained to do." Further, when the police dog has "his nose … to the ground," the officer knows that the dog is on a "fear scent."

Moreover, the generalized "fear scent" testimony was overshadowed by strong evidence of guilt. Matthews admitted he was at the Cherry Pit Bar on the night of the shooting. The police found the gun that was used to shoot Christofferson near where the police stopped Matthews. The

shoeprints in the snow near the gun and one jacket were similar to the soles of Matthews' shoes. Matthews' DNA profile was consistent with the DNA found on the gun, hat, and mask. The police discovered the relevant articles of clothing in a wooded area. When the police stopped Matthews, he had tree debris on his shoulder and he was not wearing a jacket in five-degree weather. Matthews told his mother in one phone call that "it was a situation that went wrong," and then in a later phone call, he stated that "[t]hey found the weapon, they got a coat, they got gloves, they got [a] hat ... DNA's going to pop up."

Finally, the prosecutor's use of the "fear scent" testimony in closing argument was extremely limited. During the prosecutor's 18–page closing argument, the prosecutor limited the discussion of "fear scent," using the term in only three sentences. Further, defense counsel effectively countered the "fear scent" testimony in closing argument. Specifically, defense counsel argued that the use of the term "fear scent" was "disingenuous" and that although a dog might be able to track a scent, the dog could not determine whether someone committed a crime.

Having reviewed the record in light of the four factors set forth in *Ferguson*, 581 N.W.2d at 833, we conclude there is no reasonable likelihood that admitting the "fear scent" testimony significantly affected the verdict. Consequently, Matthews is not entitled to a new trial based on the district court's admission of the "fear scent" testimony.

## II.

Matthews argues that we should reverse his conviction because the circumstantial evidence failed to establish his guilt. At oral argument, the State conceded that the circumstantial evidence test applies, but argued that the evidence was more than sufficient to convict Matthews of first-degree murder. Because the circumstances proved are consistent with guilt and inconsistent with any reasonable hypothesis of innocence, we conclude the State presented sufficient evidence to support Matthews' conviction.

■■■ When a conviction is based on circumstantial evidence, we use a two-step test to evaluate the sufficiency of the evidence. *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn.2010). First, we identify the circumstances proved and, in doing so, we defer to the fact-finder's acceptance of the proof of these circumstances and the fact-finder's rejection of evidence in the record that conflicts with the circumstances proved by the State. *Id.* at 329. Second, we examine independently the reasonable inferences that might be drawn from the circumstances proved. *Id.* We give no deference to the fact-finder's choice between reasonable inferences. *Id.* at 329–30. To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. *Id.* at 332 (citing *State v. Curtis*, 295 N.W.2d 253, 258 (Minn.1980)). We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture. *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998).

■■■ The first step is to determine the circumstances proved at trial. Briefly, those facts are that Matthews was present at the Cherry Pit Bar on the night of the shooting and a police dog tracked a trail from the location of the shooting to various items of clothing and a handgun later tied to Matthews through DNA evidence. The handgun was identified as the weapon used

to kill Christofferson. The DNA evidence excluded Moten as a source of the DNA found on the handgun, mask, hat, and other clothing the police discovered in a wooded area. Additionally, Matthews was stopped shortly after the shooting near the location where the gun was found. In two jailhouse phone calls to his parents, Matthews said, "it was a situation that went wrong," the police had recovered a handgun and clothing, and DNA was "going to pop up."

The second step is to determine whether the reasonable inferences that can be drawn from the circumstances proved as a whole are consistent with the hypothesis that Matthews is guilty and inconsistent with any rational hypothesis except that of his guilt. We begin by considering whether the circumstances proved as a whole support a reasonable inference that Matthews killed Christofferson. We conclude, based on the facts discussed above and viewed as a whole, that the circumstances proved support a reasonable inference that Matthews killed Christofferson and fled from the parking lot.

We next consider whether, as Matthews contends, the circumstances proved also support a rational hypothesis other than guilt. Matthews argues that the circumstances proved support a reasonable inference that Moten, the mini-van driver, was involved in the crime. While some of the items submitted for testing were inconclusive or had insufficient samples for testing, DNA testing excluded Moten as a possible source of the DNA found on the gun, hat, and mask. Thus, the circumstances proved do not support a reasonable inference that Moten killed Christofferson.

Matthews also identifies three other alleged shortcomings in the State's evidence that he claims support a rational hypothesis other than guilt. First, Matthews argues that a reasonable jury could construe his jailhouse conversation with his mother as a request for comfort and support, not as an admission of guilt. Second, Matthews argues that the State failed to establish a motive because a witness who worked at the bar testified that Matthews was not a troublemaker, because there was no evidence that Matthews had any contact with Christofferson in the bar or at any other time, and because the State failed to establish that Matthews knew Christofferson had $2,000 in cash. Third, Matthews argues that the police mishandled evidence, including laying items of clothing on the floor of the police station.

We conclude that the alleged shortcomings do not support a reasonable inference other than that of guilt. All three alleged shortcomings involve questions of fact, which we must assume the jury resolved in the State's favor. Further, even if the alleged shortcomings were part of the circumstances proved and would arguably weaken the evidence of guilt, they do not support a rational hypothesis other than guilt.

In summary, when all of the circumstances and inferences are evaluated together, the facts support the reasonable inference that Matthews was the shooter and he killed Christofferson, and do not support a rational hypothesis other than guilt. Therefore, we affirm Matthews' conviction of first-degree murder.

Affirmed.