OPINION
DIETZEN, Justice.
Appellant Anthony James Cox was found guilty by a Scott County jury of first-degree premeditated murder, two counts of first-degree intentional felony murder (burglary and aggravated robbery), and first-degree- aggravated robbery. The murder charges arose out of the death of Aaron Moran on October 22, 2013. Prior to trial, the district court denied Cox’s motion to suppress a statement he made to the police. The district court sentenced Cox to life without the possibility of release for the first-degree premeditated murder conviction and a concurrent 81-month sentence for the first-degree aggravated robbery conviction. For the reasons that follow, we affirm.
• In October 2013, Cox and his friend Brooks Kurr decided to rob Aaron Moran at his home in Shakopee, Minnesota. Although Cox had never met Moran, Kurr knew Moran quite well. Between.September 2012 and'September 2013, Kurr and Moran worked together at Affordable Town Car. Kurr had driven to Moran’s home several times-; knew he often carried cash, and had seen him possess marijuana. Thus, Kurr believed Moran was a drug dealer who might have drugs and money at his home. By October 2013, Kurr’s relationship with Moran had soured because Kurr believed he lost his job at Affordable Town Car in part due to Moran and that Moran had set- him up to be robbed on two prior occasions. In fact, when the police later asked personnel at Affordable Town Car if they could think of anyone who might have “a reason to hurt” Moran, they immediately identified Kurr.
On the night of October 8, 2013, Kurr and Cox organized an attempt to rob Moran. Kurr drove Cox past Moran’s home, parked a few blocks away, and gave Cox a .38 caliber handgun “for intimidation purposes and, .., if necessary, force” to accomplish the robbery. Because Moran might recognize Kurr, Cox agreed to commit the robbery by-himself. Cox stepped out of the car and walked-in the general direction of Moran’s home. As Cox walked through the neighborhood, he became lost and was unable to locate Moran’s home. He therefore abandoned the robbery that night.
Sometime between October 8 and October 22, Cox purchased a .357 magnum revolver. The revolver had the capacity to hold six bullets. Cox would later tell police he developed “pretty good aim,” and when he went to the gun range he used a two-handed grip.
' On the night of October 22, 2013, Kurr and Cox returned to Moran’s neighbor *406 hood. On this occasion, Cox knew the exact location of Moran’s home. The plan was the same as on October 8, except that this time Cox brought the fully loaded .357 magnum. Cox wore a mismatched pair of gloves. On ■ his right hand, he wore a “pistol grip-type glove.”[1] On his left hand he wore a cotton glove. Cox also placed extra bullets in his pocket.
When Cox unlawfully entered Moran’s home, he encountered Moran’s 15-year-old nephew B.M., who was'playing a video game.' Cox told B.M. “this is a robbery” and directed him to pause the video game. After closing the curtains, Cox asked B.M. if anyone else was present in the home. When B.M. indicated that no one else was present, Cox asked, “If there [is] someone in the house [is- it] okay if I just killed everybody ... ?”[2] Cox then directed B.M. to take him on a tour of the home.
As B.M. stood up and began walking towards the hallway, Moran walked in the front door and said, “Whoa.” Cox raised the .357 magnum from his side and pointed it at Moran. Looking back and forth between Cox and B.M., Moran smiled, apparently believing that Cox’s presence was some kind of joke. Cox did not tell Moran that this was a robbery or demand any cash or drugs. Instead,. Cox said, “This is the one I’m looking for.” A few seconds later, Moran’s cell phone began to ring. As Moran reached for the phone, Cox repeatedly ordered Moran to show his hands. Ignoring Cox’s orders, Moran pulled the phone completely out of his pocket. B.M. could see that the object in Moran’s hand was a phone. Cox ordered Moran to “put down the phone.” When Moran ignored that order, Cox shot Moran in the right thigh, shattering his femur. B.M. turned away and covered his ears. According to B.M., 40 seconds elapsed between the first order and the first shot. Cox later told the police that the “[f]irst time I shot him I didn’t just pow, ” Instead, Cox offered Moran another opportunity to comply with his orders. When Moran continued to ignore his commands, Cox fired a second shot, which struck Moran in the chest, causing Moran to “stumble back towards the door,” As Moran was falling backwards, Cox fired a “third and fourth [shot] pretty much at the same time.” Moran fell onto his back and was “having a hard time breathing.” Cox directed B.M. to retrieve Moran’s wallet, which required that B.M. first roll Moran over on to his stomach. After Cox went through Moran’s wallet, he said, “Let’s continue,” which B.M. understood as a command to continue with the tour of the home.
In Moran’s bedroom, Cox directed B.M. to unlock a safe and empty its contents (paperwork and ammunition) into B.M.’s school backpack. Cox then asked B.M. if he had any duct tape or rope. When B.M. said that he did not, Cox told B.M. to put his hands on his head, close his eyes, and count to 120. When B.M. finished counting to 120, Cox was gone. B.M. immediately called 911.
Upon their arrival, the police found Moran dead on the floor. They also found four .357 bullets at the scene; one on the foyer floor, one in Moran’s pant leg, one under *407 Moran’s body, and one lodged in a door leading to a stairway.
The medical examiner performed an autopsy on Moran and concluded that he was shot four times: once in the right thigh and three times in the chest. One of the bullets in Moran’s chest traveled in a downward trajectory, and two traveled upward from front to back. The medical examiner concluded that the two bullets traveling at an upward angle were probably fired when Moran was falling backwards or already on the floor.
Witnesses from Affordable Town Car identified Kurr as a potential suspect. Investigators examined Kurr’s cell phone activity, leading them to identify Cox as a suspect as well. Investigators then tracked Cox and Kurr via their cell phone activity and 4 days later arrested Cox in an alley near Moran’s house. Cox was carrying B.M.’s school backpack, three .357 rounds, and Moran’s cell phone.
Cox arrived at the Shakopee police department around 9:45 p.m., and was interviewed by Shakopee Detective Cody Hor-ner and BCA Agent Mike Wold. Shakopee Detective Corey Schneck was present for the final hour of the interview. The interview began at 11:49 p.m. and lasted almost 5 hours, concluding at 4:45 a.m. Agent Wold began the interview by informing Cox of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When asked whether he understood those rights, Cox answered, “Uh huh.” Agent Wold informed Cox he was not free to leave, told him that the officers “kinda need to hear [Cox’s] side of the story,” and asked him if he was willing to talk. Cox answered, “Sure.”
During the interview, Cox asked investigators about the status of a police investigation into the cause of his brother’s death. Cox stated that his brother, T.T., suffered a gunshot wound to the left side of his head in 2011 and that his death was the reason Cox moved to Minnesota. Cox told the investigators that “they tried to deem [his death] a suicide at first and I heard forensics came back and reopened the case and then I never heard anything else about the situation.” Cox mentioned that he “would love to be able to [hire] private investigators,” but that he did not have the money.
Later in the interview, Cox initiated a negotiation with the investigators that resulted in his confession:
' AC: I mean this is this is my only negotiation I think it’s pretty fair. You know what I mean. My negotiation is this ... I’m a go ahead and, and kill myself (Inaudible) what you say, words, right?
MW: Yup
AC: But in exchange I need one favor it’s not a hard favor. All I need is to uhm I would like to know a little bit a information more about if anybody was checking out my brother’s murder. You know what I mean, I like to know if it was you know I mean if they found out that yes this is a murder and you know I mean something.
Agent Wold agreed to “look into” the matter, and Cox subsequently admitted he killed Moran.
In December 2013, a Scott County grand jury indicted Cox on one count of first-degree premeditated murder, Minn. Stat. § 609.185, subd. (a)(1) (2014); two counts of first-degree intentional murder while committing or attempting to commit a felony, Minn.Stat. § 609.185, subd. (a)(3) (2014); and one count of first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (2014). Cox moved to suppress the statement he gave to police following his arrest, arguing, among other things, that it was involuntary. Following a contested *408 omnibus hearing, the district court denied Gox’s motion to suppress and his case proceeded to trial.
At trial, the State presented evidence that was consistent with the facts outlined above. On the issue of premeditation, the court instructed the jurors that:
Premeditation means that the defendant considered, planned, prepared for, or determined' to commit the act before the defendant committed it. Premeditation, being a process, of the mind is wholly subjective, and hence, not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event. It is not necessary that premeditation exist for any specific length of time. A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes.an intent to kill, is not premeditated,[3]
(Emphasis added.) During closing argument, defense counsel argued Cox’s conduct was “impulsive.” The jury disagreed, finding Cox guilty of first-degree premeditated murder. Based on the jury’s verdict, the district court convicted Cox of first-degree premeditated murder and sentenced him to life in prison without the possibility of release. This direct appeal followed.
I.
Cox argues the district court committed reversible error by denying his motion to suppress his confession. Specifically, Cox alleges that (1) police promised that in exchange for his statement they would look into his brother’s death; (2) police assured him they could influence the county attorney; and (3) police told him that a “small town Scott County jury” would be more lenient if presented with a full confession.
We review a district court’s legal determination of whether a defendant’s statement was voluntary de novo. State v. Farnsworth, 738 N.W.2d 364, 373 (Minn.2007). But we accept the underlying factual, determinations of the district court regarding the circumstances of the interview unless the findings are clearly erroneous. State v. Riley,. 568 N.W.2d 518, 525 (Minn.1997).
The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given. See State v. Biron, 266 Minn. 272, 281, 123 N.W.2d 392, 398 (1963). The State must establish by a preponderance of the evidence that a statement was voluntary. Riley, 568 N.W.2d at 525. We review the totality of the circumstances to determine whether the State met its burden to establish that a statement was voluntary. State v. Zabawa, 787 N.W.2d 177, 182 (Minn.2010).
. In determining whether a defendant’s statement was voluntary, we consider the nature of the interview, including its length, the adequacy of warnings, whether the defendant’s physical needs were met, and whether the defendant was denied access to friends., Farnsworth, 738 N.W.2d at 373; State v. Pilcher, 472 N.W.2d 327, 333 (Minn.1991). The ultimate question of voluntariness is, however, whether a defendant’s will was overborne at the time of his confession. Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Farnsworth, 738 N.W.2d at 373; Riley, 568 N.W.2d at 525. Put differently, *409 we must determine whether the police actions, together with other circumstances surrounding an interview, were so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak. Farnsworth, 738 N.W.2d at 373; Pilcher, 472 N.W.2d at 333.
A.
We first consider Cox’s argument that his statement was rendered involuntary when the police promised that they would look into his brother’s death in exchange for his statement. As a genéral rule, we disfavor law enforcement making implied and express promises in the course of an interrogation. For example, in State v, Biron we concluded that a new trial was warranted after police officers persuaded a defendant that he might be treated as a juvenile offender rather than being exposed to the penalties of a felony murder charge. 266 Minn, at 282-83, 123 N.W.2d at 399. And in Haynes v. Washington, the United States Supreme Court concluded a confession was involuntary where it was induced by the express threat of “incommunicado detention” coupled with the assurance that defendant could contact his family. 373 U.S. 503, 513-514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). But, a promise — real or perceived — made by law enforcement during an interrogation does not by itself render a statement involuntary; rather, it is considered in the totality of the circumstances. Thus, in State v. Thag-gard we concluded that a statement was voluntary even though the defendant was led to believe he might receive drug treatment as a result, because the totality of the circumstances indicated he understood his rights and the gravity of the situation. 527 N.W.2d 804, 811-12 (Minn.1995).
After reviewing the record, we conclude that this case is factually distinguishable from Biron. About 1 hour and 20 minutes into the interview, Cox raised the possibility of making a deal with the officers: if they promised to look into his brother’s death,-he would tell the officers what happened. .More specifically, Cox stated that he wanted “to know a little-bit a information more about [his] brother’s, murder,” and Agent Wold indicated that he would “certainly look into that.” A few moments later, Cox asked, “[D]o we have somewhat of a mutual agreement?” Agent Wold responded, “Yah ... I will look into it.” Two pages later in the transcript, Cox admitted to shooting Moran.
The transcript of the statement demonstrates that Cox’s will was not overborne. Indeed, Cox initiated the negotiation that led to Agent Wold’s agreement and Cox’s inculpatory statement, .which distinguishes this case from Biron, 266 Minn, at 282-83, 123 N.W.2d at 394. Cox’s role in opening the negotiation also distances this case from Haynes. There, the defendant repeatedly refused to confess, and only relented after the threat, of indefinite, isolated detention coupled, with a promise that he could contact his family. Haynes, 373 U.S. at 513-14, 83 S.Ct. 1336. Rather, Cox, like the defendant in Thaggard, “nam[¿d] 'his own terms for confession.” 527 N.W.2d at 811 (“The spectacle of [defendant] naming his own terms for confession, deciding for himself with whom he would negotiate;' getting what he wanted as a consideration for • telling what he knew, reduces to absurdity his present claim that he was coerced into confession.” (quoting Stein v. New York, 346 U.S. 156, 185-86, 73 S.Ct,. 1077, 97 L.Ed. 1522 (1953))). Moreover, the evidence indicates that Cox understood his rights and. the gravity of the situation. Far from having his will overborne, we conclude that the transcript demonstrates that Cox intentionally attempted to strike a deal in return for his- confession.
*410 B.
We next consider Cox’s argument that the statements of Agent Wold and Detective Horner suggesting a full confession would be viewed favorably by a prosecutor were' coercive: A suggestion by the police that they can influence prosecutors in favor of a defendant is improper. When police make such questionable statements, we consider whether — taken in context — such statements amount to “psychological coercion which would render defendant’s confession involuntary.” State v. Slowinski, 450 N.W.2d, 107, 112 (Minn.1990). Further, it is permissible for officers to inform defendants of potential charges to encourage them to speak. See, e.g., State v. Clark, 788 N.W.2d 316, 335 (Minn.2007); State v. Merrill, 274 N.W.2d 99, 107-08 (Minn.1978). In State v. Slow-inski, we concluded that police statements to the defendant that they would tell the county attorney the defendant needed psychiatric help were improper. 450 N.W.2d at 112. However, we ultimately concluded the statements in that case were not coercive. Id. And in State v. Beckman, we upheld the admission of a confession despite an officer’s statement that defendant’s cooperation would be brought to the district court’s attention. 354 N.W.2d 432, 437 (Minn.1984).
Cox points to several statements investigators made during his interview before he confessed as evidence of coercion. For example, police officers stated:
• I wanna know that information so that we can go and tell our bosses that tonight Anthony was very truthful....
• It looks so much better that when the attorneys when they pull all of our reports together and they review your statement or review the recording of this interview tonight and they go wow here is a young man who at least said what he did he’s sorry for what he did and he didn’t mean it for it to go down that way and he was cooperative and filled in all of the other pieces all I can tell you Anthony is that people that do that (Inaudible) better I think everybody involved in the whole system just go wow_
We conclude that the police statements Cox challenges were not improper in the context in which they were given. The officers stated that a full confession would be impressive and that defendants who make a full confession generally do better in the criminal justice system. But the officers did not promise that if Cox confessed, they would attempt to obtain favorable treatment for him from the prosecutors. Consequently, the police statements in this case are significant!y different than the statements we have deemed improper in the past.[4] See Slowinski 450 N.W.2d at 112 (deeming improper officers’ statement that led a defendant to believe he would be given psychiatric help); Biron, 266 Minn, at 276-80, 123 N.W.2d at 395-97 (deeming improper officers’ statement that led a defendant to believe he would be tried as a juvenile).
C.
Cox further argues his confession was rendered involuntary by the police officers’ statements that Scott County ju *411 ries have a “small’ town” outlook and are more likely .to look favorably on a full confession. He suggests the officers “played on the societal fear of urban crime committed by young black men and how that [is] perceived in small towns.” These statements were all made to pressure Cox into implicating Kurr, which ultimately proved fruitless. We conclude that the police statements were not unduly coercive. The statement of how a jury may view certain evidence, is simply a prediction.
In sum, we conclude that the totality of the circumstances do not support Cox’s argument that his confession to police was involuntary.[5] To the contrary, a review of the relevant facts, and the transcript, reveals a discussion that cannot be characterized as hostile or coercive. Instead, Cox did not implicate Kurr in the killing of Moran during the interview despite repeated appeals from the police officers that he do so. Consequently, the district court did not commit reversible error when it denied Cox’s motion to suppress his confession.
n.
Cox challenges' his conviction of first-degree premeditated murder, arguing the circumstances proved support a rational inference that he shot Moran in a rash impulse, and therefore the State presented insufficient evidence to prove the element of premeditation. Essentially, Cox- admits the murder was intentional, but asserts that it was not premeditated. The question is therefore whether there is sufficient evidence to support the jury’s verdict that Cox committed premeditated murder.
When the State relies entirely on circumstantial evidence to prove an element of the offense, we use a two-step test to determine whether the State presented sufficient evidence to prove the element. State v. Anderson, 789 N.W.2d 227, 241 (Minn.2010); see also State v. McAllister, 862 N.W.2d 49, 53-55 (Minn.2015). First, we identify the circumstances proved and, in doing so, defer to the fact-finder’s acceptance of the proof of these circumstances and rejection of' conflicting evidence. State v. Silvernail, 831 N.W.2d 594, 598-99 (Minn.2013). Second^ we examine the reasonable inferences that can be drawn from the circumstances proved. State v. Matthews, 800 N.W.2d 629, 636 (Minn.2011). We give no deference to the fact-finder’s choice between reasonable inferences. Id.
 To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with, any rational hypothesis other than guilt. State v. Andersen, 784 N.W.2d 320, 332 (Minn,2010) *412 (citing State v. Curtis, 295 N.W.2d 253, 258 (Minn.1980)). When applying this' test, we view the circumstances proved as a whole and not as discrete and isolated facts. Matthews, 800 N.W.2d at 635-36; see also State v. Palmer, 803 N.W.2d 727, 733 (Minn.2011). We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture. State v. Lahue, 585 N.W.2d 785, 789 (Minn.1998).
A person who “causes the death of a human being with intent to effect the death of that person or another,, but without premeditation” is guilty of second-degree murder. Minn.Stat. §' 609.19, subd. 1(1) (2014). In contrast, a person who “causes the death of a human being with premeditation and with intent to effect the death of the person or of another” is guilty of first-degree premeditated murder. Minn.Stat. § 609.185, subd. (a)(1).
“Premeditation” means “to consider, plan or prepare for, or determine to commit, the act referred to prior .to its commission.” Minn.Stat. § 609.18 ,(2014). Premeditation does not require proof of extensive planning or preparation, nor does it demand that a specific time period elapse for deliberation. State v. Cooper, 561 N.W.2d 175, 180 (Minn.1997). Instead, the State must simply establish'that there was some appreciable passage of time between a defendant’s formation of the intent to kill and the act of killing, and that during this time defendant deliberated about the act. State v. Leake, 699 N.W.2d 312, 319 (Minn.2005). Premeditation is a state of mind , “generally proven through circumstantial evidence.” State v. Hughes, 749 N.W.2d 307, 312 (Minn.2008) (quoting Leake, 699 N.W.2d at 319).
We have previously observed that an inference of premeditation may be supported by several categories of evidence, including planning activity, motive, the nature of the killing, and a defendant’s actions following the killing. State v. Barshaw, 879 N.W.2d 356, 363 (Minn.2016) (identifying planning activity, motive, and the nature of the killing as relevant to premeditation); State v. Moore, 846 N.W.2d 83, 89 (Minn.2014) (same); Leake, 699 N.W.2d at 321 (identifying the defendant’s actions before and after the murder as relevant to premeditation). While evidence of motive is relevant, it is unnecessary to a finding of premeditation. Palmer, 803 N.W.2d at 735. Because the State does not discuss motive on appeal, our analysis focuses on Cox’s planning activity, the nature of the killing, and Cox’s actions following the 'killing. We consider each of these categories in turn.
A.
Planning activity relates to “facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing.” Hughes, 749 N.W.2d at 313 (quoting Moore, 481 N.W.2d at 361). Planning activity can consist of “prior possession of the murder weapon by the defendant.” Palmer, 803 N.W.2d at 734 (quoting Hughes, 749 N.W,2d at 313). We have observed that “arming oneself prior to a robbery expecting to kill if need be anyone obstructing the plans, would be sufficient to come within the definition [of premeditation] even though it may be hoped and anticipated that the need for killing would not occur.” State v. Kirch, 322 N.W.2d 770, 773 (Minn.1982) (quoting Minn.Stat. Ann. § 609.18 (West 1964) (advisory comm. cmt.)). Although we have never discussed whether putting a pistol grip glove on one’s trigger hand supports a finding ‘ of premeditation, the California Court of Appeal has said “the fact defendant wore a glove, on one hand, his shooting hand, supports] a reasonable inference defendant killed as a result of deliberation *413 and premeditation” because “[w]earing the one glove shows defendant intended to use the gun,” People v. Diaz, No. G046207, 2013 WL 286275, at *4 (Cal.Ct.App. Jan. 25, 2013). While Diaz doés not provide controlling legal precedent, we find its reasoning persuasive. A person who does riot intend to fire a gun has no need to wear a specialized glove that improves performance arid cushions the shooting hand.
The circumstances proved regarding Cox’s planning activity are as follows. Kurr and Cox planned the armed robbery of Moran’s home because Kurr believed that Moran was the reason Kurr was fired from his job, and that Moran had money and drugs at his home. Before the robbery, Cox armed himself with a fully loaded .357 magnum handgun and placed extra bullets in his pocket. He wore a pistol grip glove on his shooting hand, and a mismatched cotton glove on his other hand. Prior to the night of the shooting, Cox practiced shooting the handgun. While he awaited Moran’s arrival, Cox told B.M. he might “just kill everybody” if B.M. was lying to him. When Moran arrived, Cox said, “This is the one I’m looking for.”
The circumstances proved, as a whole, support a rational inference that Cox premeditated the murder of Moran. It is reasonable to infer that Cox planned an armed robbery and killing if necessary to accomplish his criminal objective. Like the defendant in Kirch, 322 N.W.2d at 773, Cox armed himself with a handgun in anticipation that the robbery might require him to use it against the occupants of Moran’s home. Cox practiced shooting the handgun so that he would be prepared to shoot the occupants of the home. Cox also wore a pistol grip glove designed to cushion a person’s hand when a' gun is fired and placed additional bullets in his pocket, both of which support an inference that he contemplated firing the gun before he entered Moran’s home. Further, even before Moran arrived, Cox told B.M. that he might kill everybody in the home. When Moran arrived, Cox identified him as “the one” he was looking for, which supports a reasonable inference that Cox did not simply intend. to steal items from Moran’s home but instead intended to rob Moran at gunpoint and, if necessary,'kill Moran to accomplish his criminal objective-.
'.Moreover, these circumstances are inconsistent with a rational inference that Cox’s killing of Moran was the product of a rash impulse. It is true that the circumstances proved support a rational inference that Cox’s initial criminal objective might hot have been kill Moran, but rather to rob Moran at gunpoint. ’ Cox’s plan plainly focused on the armed robbery of Moran. But it is unrriasonable to infer that Cox did not plan to kill the individuals in the home if necessary to accomplish this initial criminal objective. We therefore conclude that the circuriistances proved as a whole regarding Cox’s planning activity áre consis-terit with a rational inference that Cox considered killing Moran ahead of time and inconsistent with a rational inference that Cqx’s murder of Moran was a rash impulse.
B.
We next turn to the nature of the killing. Previously, .we have concluded that evidence of even a short pause between shots may support an inference of premeditation. State v. Buchanan, 431 N.W.2d 542, 548 (Minn.1988) (“[W]here first shots are followed; by a pause and second shots, an inference of premeditation is proper.”). Also, evidence showing that the defendant inflicted wounds to the victim’s vital organs may support an inference of premeditation. State v. Ortega, 813 N.W.2d 86, 101 (Minn.2012). Moreover, the fact that the defendant fired *414 additional shots from a handgun after the victim was incapacitated may support an inference of premeditation. See Palmer, 803 N.W.2d at 736-37 (reasoning evidence showing that the defendant “stood over [the victim] and finished him off,” including the downward trajectories of some of the bullets, supported the jury’s finding of premeditation); State v. Clark, 739 N.W.2d 412, 423 (Minn.2007) (reasoning evidence showing that the fatal second wound was inflicted while the' victim was lying on the floor supported the jury’s finding of premeditation).
The circumstances proved regarding the nature of Cox’s killing of Moran are that Moran walked in the front door and Cox, who was standing across the room from him, raised the .357 magnum from his side and aimed it at Moran. Surprised by Cox’s presence, Moran said, “Whoa.” Looking back and forth between Cox and B.M., Moran smiled, apparently believing that Cox’s presence was some kind of joke. Upon Moran’s arrival, Cox did not immediately shoot Moran four times in rapid succession. Cox also did not tell Moran that this was a robbery or demand any cash or drugs. Instead, Cox focused upon Moran by saying, “This is the one I’m looking for.” Moran’s cell phone began to ring. In spite of Cox’s order to show his hands, Moran reached into his pocket and pulled the phone out of his pocket. B.M. could see that the object in Moran’s hand was a phone. Cox ordered Moran to “put down the phone.” When Moran ignored that order, Cox shot Moran in the right thigh, shattering his femur. B.M. turned away and covered his ears. Forty seconds elapsed between the first order and the first shot. After the first shot, Cox offered Moran another opportunity to comply with his orders. When Moran continued to 'ignore him, Cox fired a second shot that struck Moran in the chest, causing Moran to “stumble back towards the door.” As Moran fell ■ backwards, Cox fired a “third and fourth [shot] pretty much at the same time.”
The circumstances proved, when considered as a whole, support a rational inference that Cox premeditated the murder of Moran. Cox paused between the first, second, and third shots. See Buchanan, 431 N.W.2d at 548. The first shot incapacitated Moran when it shattered his femur. See Palmer, 803 N.W.2d at 736-37. The remaining shots struck Moran in the chest, damaging vital organs. See Ortega, 813 N.W.2d at 101. Cox used a .357 magnum to kill Moran, a semiautomatic weapon that fires one-bullet per pull of the trigger. These circumstances are all consistent with a rational inference of premeditation and inconsistent with a rational inference that Cox shot Moran in a rash impulse.
C.
We also consider a defendant’s actions following a killing when determining whether there was premeditation. See Leake, 699 N.W.2d at 321; Kirch, 322 N.W.2d at 774. Removing valuables from the body after killing the victim is considered evidence of premeditation. See Pilcher, 472 N.W.2d at 336. The failure to administer any aid to a victim who does not die instantaneously also supports an inference of premeditation. See Anderson, 789 N.W.2d at 242-43. And laughter following a murder is “inconsistent with having acted on a rash impulse that arguably should lead to quick regret.” State v. Johnson, 616 N.W.2d 720, 726 (Minn.2000) (internal quotation marks omitted).
The circumstances proved regarding Cox’s actions after he shot Moran include the following. The first words Cox uttered after he stopped shooting were, “Now I only have two [bullets] left.” Cox made B.M. roll Moran over and retrieve *415 Moran’s wallet from his pocket. Cox made no effort to aid Moran. Instead, after examining the contents of Moran’s wallet, Cox said, “Let’s continue,” which B.M. understood as a command to continue the tour of the home. Before he left, Cox asked B.M. if he had any duct tape or rope. When B.M. said he didn’t have any, Cox told him to put his hands on his head and count to 120. Later that night, Cox was laughing and showing his gun to others in a Minneapolis recording studio. On the following day, Cox laughed when Kurr discovered Moran was dead, and said, “I always wanted to kill a white boy ever since a white boy killed my brother.”
The circumstances proved, when taken as a whole, support a rational inference that Cox premeditated the murder of Moran. As Moran lay on the ground struggling to breathe, Cox stole his wallet. See Pilcher, 472 N.W.2d at 336. Cox failed to render aid to Moran and considered restraining B.M. with duct tape or rope, which would have prevented B.M. from calling 911 to obtain emergency assistance for Moran. See Anderson, 789 N.W.2d at 242-43. Cox laughed when Kurr discovered Moran was dead, and said “I always wanted to kill a white boy ever since a white boy killed my brother.” See Johnson, 616 N.W.2d at 726. These circumstances, when viewed as' a whole, are consistent with a rational inference of premeditation and inconsistent with a rational inference that Cox shot Moran in a rash impulse.
Cox and the dissent separately analyze and parse each fact to argue the murder was the product of a rash impulse and not premeditated. This argument is flawed. Our circumstantial evidence standard requires that we examine the circumstances proved as a whole and not piecemeal. Matthews, 800 N.W.2d at 635-36. Here, the circumstances proved, examined as a whole, support a reasonable inference that Cox premeditated the murder of Moran and are inconsistent with a reasonable inference that his conduct was the result of a rash impulse.[6]
III.
In sum, the district court did not commit reversible error when it denied Cox’s motion to suppress, because the totality of the circumstances do not support Cox’s argument that his confession to police was involuntary. In addition, the circumstances proved regarding Cox’s planning activity, the nature of the killing, and Cox’s actions following the murder, examined as a whole, are consistent with a rational inference that Cox premeditated the murder and inconsistent with Cóx’s argument that his murder of Moran was the product of a rash impulse.
Affirmed.
*416 CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

. A pistol grip glove or “shooter’s glove” is a • glove "worn by individuals shooting guns to lessen the recoil shock” and "sold separately rather than in a pair; it is intended to be worn on the trigger hand alone.” U.S. Customs & Border Protection, HQ 083694 (1989).

. This quote is taken from Cox’s own statement to police. B.M. testified that Cox replied, "If you’re lying, would it be alright if I shoot you?”

. The instruction substantially mirrored' the language of the standard jury instruction on premeditation. 10 Minn. Dist. Judges Ass’n, Minnesota Practice — Jury Instruction Guides, Criminal, CRIMJIG 11.05 (6th ed.2015).

. Cox also relies on statements made after his confession, all of which were made in an effort to persuade Cox to inculpate Kurr. Cox’s argument that these statements overwhelmed his will and caused him to incriminate himself lacks merit for two reasons. First, these statements were made by officers after Cox confessed to shooting Moran. And second, all of these statements were made in an effort to persuade Cox to inculpate Kurr. Thus, logically, none of the statements could have had any bearing on Cox’s confession that he killed Moran.

. Cox also points to other factors that he believes lead to the conclusion that his confession was involuntary. These include Cox’s age, the length of the interview, the fact that he was in custody and did hot initiate the interview, and the fact that he made a confession. . These arguments are without merit. Cox was not a minor when he made his confession; he was 21 years old and had previous contacts with the criminal justice system. Cox was presented with a Miranda warning, and he indicated that he understood his, rights and wished to proceed with the .interview. . Cox concedes that he was "given access to food, water and a bathroom” during the interview, that the 'tone of' the interview was "not on balance hostile,” and that those factors ought to be considered when assessing whether his subsequent statement was voluntary. Cox’s argument that the interview was overlong is misleading -because while it lasted nearly 5 hours, he confessed after less than an hour and a half. See Clark, 738 N.W.2d at 330, 333 (stating a 2-hour interview is fairly short).

. The circumstances proved taken together are as follows. Cox planned the armed robbery of Moran's home, including the potential murder of those he encountered, to accomplish his criminal objective. Cox practiced shooting the handgun, and brought a fully loaded handgun, extra bullets, and a shooting glove with him so that he was ready to murder the occupants of the home if necessary. Cox unlawfully entered Moran’s home, and told B.M. that he might kill everyone in the home if B.M. lied to him. When Moran arrived Cox stated that Moran is "the one I’m looking for.” Moran’s cell phone rang and Cox ordered Moran to show his hands. When Moran ignored Cox’s command to "put down the phone,” Cox shot Moran in the leg shattering his femur. Forty seconds elapsed between the first command and the first shot. Moran was wounded and' unarmed. When Moran ignored the second command, Cox shot Moran in the chest causing him to stumble and fall. Cox shot Moran in the chest two more times.